TRINITY PENTECOSTAL CHURCH OF JOPLIN, MO., INC., Plaintiff-Appellant,

v.

Travis H. TERRY, et al., Defendants-Respondents.

No. 12981.

Missouri Court of Appeals, Southern District, Division One.

Oct. 31, 1983.

James B. Fleischaker, Roberts & Fleischaker, Joplin, for plaintiff-appellant.

Max H. Glover, Webb City, for defendants-respondents.

PER CURIAM:

In this court-tried action plaintiff Trinity Pentecostal Church of Joplin, Missouri, Inc., sought various items of relief, including a declaratory judgment as to who are its rightful officers and directors (Count I), an injunction prohibiting defendants from holding themselves out as officers and directors of plaintiff (Count II), and the recovery of certain premises and personal property in the possession of defendants (Counts III and IV). Defendants in their answer denied, inter alia, that those persons alleged by plaintiff to be its officers and directors in fact hold such positions and asserted, by way of counterclaim for damages for injury to plaintiff's reputation, that certain of the defendants are the rightful officers and directors of plaintiff.

The court resolved Count I in favor of defendants, holding that defendants James W. Nicholson, Russell Wasson, and David Roach are directors of plaintiff, that defendant Shirley Hansen is the secretary/treasurer, and that defendant Travis H. Terry is the de facto pastor, president, and a member of the board of directors. Consequently, the court denied plaintiff the relief prayed for in Counts II and III. With respect to Count IV, the court held neither plaintiff nor defendants entitled to possession of the items of personal property in question, except for a school bus which defendants were ordered to deliver to Calvary Temple, an organization whose role in the events leading to this action will be elucidated as the facts are developed, infra.

The seed which produced this bramble of a case was sown in August of 1979. It was then that representatives of two theretofore separate and distinct Joplin churches, plaintiff Trinity Pentecostal Church, Inc. (hereinafter "Trinity") and Calvary Temple ("Calvary"), began meeting to consider the possibility of the two churches working together to establish and operate a Christian school. The record suggests that while neither church alone was of sufficient means to achieve this mutually desired goal, concerted action between the two stood as a feasible alternative.

After preliminary discussions on or about August 11, 1979, between representatives of Calvary and Trinity's board of directors, a meeting was held at Calvary on August 18, 1979, attended by all members of both the Calvary and Trinity boards of directors. At this meeting details of what has been referred to in the record as a "merger" were formulated and memorialized under the heading "Agreements of Merger." This "merger" plan consisted primarily of various personnel shifts presumably designed to facilitate joint activity between the churches. Trinity's pastor and one of the defendants herein, the Reverend Travis Terry, was to resign as pastor of Trinity while Calvary's pastor, the Reverend S.L. Corley, Jr., was to become pastor of the combined congregations. Reverend Terry was to become a member of an integrated board of directors which would be composed of members of the board of each church and which would govern the joint churches and the school. Further, Shirley Hansen was to resign as a member of Trinity's board and become secretary of the school.

In addition, the merger plan, reflecting a Calvary perspective, included the acceptance of all Trinity members "as ours"; the combined churches would carry on their activities in the name of Calvary Temple. The building located at 501 Patterson in Joplin which, prior to the Trinity-Calvary affiliation, had been the site of Trinity's worship activities, was to become Calvary Christian Academy, alternatively the Christian Educational Annex of Calvary Temple.

There was testimony that the Trinity and Calvary representatives in attendance at the August 18 meeting were to present the

"merger" proposal to their respective churches for their approval or rejection. Alan Griffin, a member of Trinity prior to the commencement of joint activity with Calvary, testified that on or about August 19, 1979, a meeting of Trinity's entire membership was held, at which the proposal was, with the exception of one abstention, unanimously accepted. A few days later the Trinity board met to accept the resignation of Rev. Terry as pastor of Trinity and to approve the Rev. S.L. Corley, Jr., as pastor of the combined congregations. Gayle Reeder was elected secretary at that meeting. Subsequently Shirley Hansen resigned from the Trinity board of directors and the Trinity membership voted to accept the Calvary board as its board. The minutes of the first meeting of the integrated board, held on August 25, 1979, reflect that that body voted in favor of having all Trinity members accepted as voting members of Calvary.

From the latter part of August or early September 1979, the two churches conducted their activities jointly. Those who had previously been members of Trinity attended Sunday worship services at Calvary, along with the Calvary members. These services were held at 1800 E. 30th, Joplin, and the Trinity building at 501 Patterson was used for the school. This arrangement continued in effect until sometime in September of 1981. During this two-year period there were no separate meetings of the Trinity board or membership as such. All matters affecting the combined churches were handled by the integrated board, which, as already noted, met under the name of Calvary.

With respect to finances, the combined churches were sustained by collections from all members; no attempt was made either to segregate funds on the basis of the particular church affiliation of the contributor or to maintain records of Trinity expenses separate from Calvary expense records. There was no separate bank account in the name of Trinity. However, annual registration reports for Trinity, as a not for profit corporation, were filed with the Secretary of State of Missouri in 1980 and 1981. The 1981 report listed as officers and directors of Trinity, Inc., those persons who had been elected in early 1981 as officers and directors of the combined churches. Shirley Hansen, who completed the 1981 report, testified it was her assumption that those persons would also constitute the governing body of Trinity, Inc. Those listed as board members on that document were Jewell Hunt, S.L. Corley, Sr., Travis Terry, Richard Arehart, and Alan Griffin. The officers listed were S.L. Corley, Jr., president; S.L. Corley, Sr., vice-president, and Shirley Hansen, secretary/treasurer. Of these officers and directors, Travis Terry, Richard Arehart, Alan Griffin, and Shirley Hansen had originally been Trinity members.

By the latter part of 1980 problems had arisen which for some would eventually provide reason to stop attending the combined church services. James Nicholson, a member of Calvary for some twelve years, testified that as of November, 1980, when he left Calvary, that church's indebtedness had grown to more than $55,000. Reverend Terry, also a participant in the minor exodus which began in late 1980, attributed his departure to disagreements over the way the combined churches were being run, as well as to the financial difficulties. He testified that S.L. Corley, Jr., president of the combined churches, was not "using the members of Trinity as we thought we agreed upon."

Calvary Christian Academy remained in operation for two school years, from September, 1979, through June, 1981. On June 10, 1981, the integrated board, consisting at that time of S.L. Corley, Jr., S.L. Corley, Sr., Jewell Hunt, Richard Arehart, and Alan Griffin, met and decided to sell the property at 501 Patterson which had been used for the school and which had originally been Trinity's church building. It was agreed that the property would first be offered to Rev. Terry at a price of $32,000 and, failing his acceptance, would be listed with a realtor at $39,500. A letter containing the offer, signed by all board members, was sent to Terry but he testified he never

received it. In any event, the property was listed with Pro-100 Realtors and an offer of $35,000 obtained. A contract for sale was executed on September 8, 1981, by and between Trinity, as seller, and Rev. Donald Tallman d/b/a Believers Fellowship, as buyer. Signing on behalf of Trinity were S.L. Corley, Sr., Richard Arehart, Alan Griffin, and Jewell Hunt.

The sale was never consummated. On September 13, 1981, the real estate broker handling it received a letter from Rev. Terry's attorney which stated that the people who had purported to act on behalf of Trinity in disposing of the property at 501 Patterson had had no authority to do so. A copy of this letter was also sent to the prospective buyer, who eventually withdrew his offer.

Sometime after the decision to sell the building at 501 Patterson, S.L. Corley, Sr., entered into an agreement with a church group in Texas to sell various items of personal property, mostly school supplies, that had been used in the operation of the school. Included among these were a school bus, a van, desks, books, a reading machine, etc. Though the bus was titled in the name of Trinity, all the other property had been acquired after August 1979, when Trinity and Calvary commenced affiliation. Before the bus could be transported to the buyer in Texas, Rev. Terry stopped by 501 Patterson and drove it to his residence, where it remained until the time of trial.

Meanwhile on September 12, 1981, those who from late 1980 through early 1981 had stopped attending services of the combined churches at 1800 E. 30th held a meeting at the home of James Nicholson. This group ("Terry group") was composed of some, but not all, of those who had originally been Trinity members as well as some who had previously been Calvary members.[1] Their common denominator was dissatisfaction with the way things had been going with the churches in combination. At this meet-ing the group decided to hold worship services the next day, September 13, at 501 Patterson.

The Terry group did hold services at 501 Patterson on September 13, 1981. At those services Rev. Terry announced that a membership meeting would be held the afternoon of Sunday, September 20. This announcement was repeated on Wednesday evening, September 16, and on Sunday morning, September 20. No advance notice of the membership meeting was given to anyone other than those in the Terry group. Those not notified included Richard Arehart and Alan Griffin, both of whom had been Trinity members prior to August, 1979, but who continued to attend the combined services. At the September 20 meeting Rev. Terry was elected pastor; James Nicholson, Russell Wasson, and David Roach were elected directors; and Shirley Hansen was elected secretary/treasurer.

Plaintiff brought the instant action in October, 1981, alleging in Count I that its directors are Jewell Hunt, S.L. Corley, Sr., Richard Arehart, and Alan Griffin and that its officers are S.L. Corley, Sr., president, and Richard Arehart, secretary. In Count II, plaintiff sought to enjoin those persons elected at the September 20, 1981, election held by the Terry group from representing themselves as occupants of the positions to which they now claim entitlement. Other relief sought will be discussed, infra.

We begin consideration of this nettlesome case by noting that any resolution we might reach will be marked by some measure of infirmity, for the record affords us plenty of opportunity to find fault with each of the respective positions contended for by these rival camps of litigational Christian soldiers. What is more, our task as reviewing court is made difficult by the circumstance that the Trinity-Calvary "affiliation" was consummated with such informality as virtually to defy identification of the result-

---

1. The group included all the defendants in this cause: Rev. and Mrs. Travis Terry, Mr. and Mrs. James Nicholson, Mr. and Mrs. David Roach, Mr. and Mrs. Russell Wasson, Shirley Hansen, and Jan Funk. Richard Arehart and Alan Griffin, both originally members of Trinity, continued to attend services at Calvary. The Nicholsons and Wassons were originally Calvary members.

454

ant entity and, hence, any reasoned attempt to decide what legal standards should be applied in dealing with "it" and the instant situation.

Perhaps the most helpful authority we might turn to at this point is that which delineates the narrow scope of appellate review of court-tried cases. In the oft-cited case of *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976), our supreme court construed Rule 73.01(c)[2] to mean

> that the decree or judgment of the trial court will be sustained by the appellate court unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law.

Lest the second of these bases for reversal be interpreted too broadly, the court admonished that "[a]ppellate courts should exercise the power to set aside a decree or judgment on [that] ground ... with caution and with a firm belief that the decree or judgment is wrong." Our review thus circumscribed, we proceed to the merits of this appeal.

The trial court appears to have attached a good deal of significance to what it determined was the original purpose behind Trinity's decision to affiliate with Calvary. Trinity, it was found, had in the summer of 1979 desired to start a church school and the idea of working in concert with Calvary arose simply as a feasible means to realize this desire. There was no intent—on the part of Trinity, at least—to "merge" with Calvary in the sense that Trinity would lose its distinct identity either as a congregation or as a not for profit corporation; all joint activity with Calvary would be merely incidental to establishment of the school. That annual registration reports were filed on behalf of Trinity, Inc., in 1980 and 1981 lends support to this view. When in late 1980 certain of the Trinity members became disenchanted with the joint arrangement, they ceased attending services at 1800 E. 30th and on September 20, 1981, reaffirmed the distinct existence of Trinity by purporting to elect its officers and directors. The trial court found the September 20 election to have been conducted in "substantial compliance" with the Trinity Constitution and bylaws and therefore sufficient to constitute valid action of and affecting Trinity, Inc. The court went on to note that those persons who, purportedly acting on behalf of Trinity, had signed the contract for sale of the property at 501 Patterson had never been validly elected as representatives of Trinity, Inc. The court thus experienced little difficulty in deciding that those elected at the September 20 election, defendants herein, were the rightful officers and directors of Trinity, Inc.

Plaintiff's first and most salient point is that the September 20 election held by the Terry group was not in substantial compliance with the Trinity Constitution and bylaws. There are two significant respects in which the election is said to have been flawed. First, those in attendance at the meeting on September 20 had by that time lost their status as voting members of Trinity because they had not been regularly attending Trinity services, as required by the Trinity Constitution as a condition of voting membership. Plaintiff suggests, as did the testimony of defendant Travis Terry himself, that attendance at the joint services held at 1800 E. 30th would have satisfied this attendance requirement but that the members of the Terry group ceased to avail themselves of this option at various times throughout late 1980 and 1981. Thus, plaintiff concludes, when they met on September 20, 1981, and purported to hold an election of Trinity officers and directors, they were no longer Trinity voting members and the election was therefore of no legal effect.

Second, plaintiff contends that the Terry group failed to satisfy the requirements of the Trinity Constitution regarding notice of elections. The significance of this dereliction, it is said, derives from the circumstance that not all Trinity members were members of the Terry group which con-

**2.** References to rules and statutes are to V.A. M.R. and V.A.M.S., respectively.

vened on September 20, 1981; some—Richard Arehart and Alan Griffin—continued to attend services at 1800 E. 30th.[3] Thus, plaintiff asserts, a situation existed in which non-members of Trinity met to elect officials of Trinity but failed to give proper notice of election to the actual members of Trinity who continued to attend services at Calvary. Failing proper notice, the election was invalid and the positions in question remained occupied by those who had previously been holding them.

These features of plaintiff's interpretation of this case are discussed more fully, infra. Suffice it to note at this juncture that, by heavily emphasizing that the September 20, 1981, election was not held in compliance with the Trinity Constitution and bylaws, plaintiff distracts attention from an equally important aspect of its case. In Count I of its amended petition plaintiff alleged that Jewell Hunt, S.L. Corley, Sr., Richard Arehart, and Alan Griffin comprise its board of directors and that its officers are S.L. Corley, Sr., president, and Shirley Hansen, secretary. In Count II plaintiff, by seeking to enjoin defendants from representing themselves as its officers and directors implicitly, yet nonetheless affirmatively, denied that defendants hold such positions. Plaintiff's burden at trial therefore consisted of establishing not only that certain persons *are not* entitled to the positions in question but also that certain other persons *are* entitled to such positions.[4]

Plaintiff did not and does not now directly assert that those persons it seeks declared officers and directors of Trinity were in fact validly elected to those positions. Rather, it attempts to claim the benefit of the presumption that officers of a corporation, in possession of their respective offices, were regularly elected and are entitled to hold those offices. *State ex rel. Bornefeld v. Kupferle,* 44 Mo. 154 (1869).

Plaintiff refers to two items of evidence as demonstrating that those persons it now claims are its rightful officers and directors comprised the Trinity leadership prior to the allegedly defective election held on September 20, 1981. First, in answer to certain of plaintiff's interrogatories, defendant Terry listed as the Trinity leadership the following persons: Richard Arehart and Alan Griffin, directors in 1979 and 1980; Jewell Hunt and S.L. Corley, Sr., directors in 1980; S.L. Corley, Jr., pastor and president from September, 1979, until he left sometime in August, 1981; and S.L. Corley, Sr., vice-president in 1980. Terry also listed himself as president and James Nicholson as vice-president, both as of September 12, 1981. Russell Wasson and David Roach were stated to have become directors at the September 20, 1981, election. Second, plaintiff calls attention to Trinity's annual registration report, prepared in March, 1981, by Shirley Hansen. As mentioned, supra, it lists as directors Jewell Hunt, S.L. Corley, Sr., Travis Terry, Richard Arehart, and Alan Griffin and as officers S.L. Corley, Jr., president, and Shirley Hansen, secretary/treasurer.

While these sources indicate that the persons plaintiff now contends are its officers and directors indeed held those positions immediately prior to September 12, 1981, thus giving rise to the above-noted presumption of regularity, we think there was sufficient evidence to warrant a court in finding that presumption rebutted. Perhaps of greatest significance is that evidence which provided the basis for the trial court's determination (discussed, supra) that, in deciding to join forces with Calvary in August of 1979, the Trinity leadership had not contemplated anything more involved than a single-purpose cooperative venture. This finding, to be accorded its full import, must be superimposed over the

---

**3.** By plaintiff's analysis, these people, by virtue of their continued attendance at Calvary, were the only ones who could consider themselves true voting members of Trinity. It would be only slightly hyperbolic to suggest that the Lord's reaction to construction of the Tower of Babel engendered less confusion than has the

relationship of these two churches. *See* Genesis, Chapter 11.

**4.** It is observed that to discharge either of these burdens is not necessarily to discharge the other.

more particular, collectively ambiguous pieces of evidence relating to whether the integrated board was in fact accepted by Trinity as *its* board. Looking at the case in this cast, we think the trial court properly found that those persons alleged by plaintiff to constitute the governing body of Trinity Pentecostal Church, Inc., were never validly elected *as such*. The most that can be said on the basis of the record, the conclusion most consistent with the original, limited purpose of the coalition, is that they may have been validly elected as officers and directors of the combined churches *as such*.

■ Defendants in their brief make much of the fact, found by the trial court, that the two churches never legally merged. The thrust of this emphasis is that not only did the Trinity membership not agree that the integrated board would serve as *its* board (as opposed to agreeing that the integrated board would serve as board for the coalition); the two churches never became affiliated in such a way or to such a degree that the integrated board could be said to constitute the governing body of a unitary organization into which Trinity had been absorbed. A true merger within the meaning of either the General Not for Profit Corporation Law of this state, RSMo Chapter 355, or the provisions of Chapter 352, dealing with the incorporation of religious and charitable associations, requires that each of the affiliating entities be incorporated. See § 355.195 et seq. and § 352.140 et seq. Essentially, merger consists of a combination whereby one of the constituent corporations remains in being—absorbing or merging in itself all the other constituent corporations. *Dodier Realty and Investment Co. v. St. Louis National Baseball Club,* 361 Mo. 981, 990, 238 S.W.2d 321, 325[3] (banc 1951). Inasmuch as Calvary was never incorporated, a merger between it and Trinity was a legal impossibility. Thus, although Trinity was more or less "dormant" during the period of joint activi-

ty with Calvary, it never lost its status as a distinct not for profit corporation.

■ Calvary, on the other hand, at all relevant times remained an unincorporated religious association. As such, it was without capacity to hold and pass title to real estate. *Farm and Home Savings and Loan Ass'n. v. Armstrong,* 337 Mo. 349, 357, 85 S.W.2d 461, 466[7] (banc 1935); *Tucker v. Diocese of West Missouri,* 264 S.W. 897, 901[4] (Mo.1924). Joint activity with Trinity did nothing to alter Calvary's essential character. When the integrated board decided to sell the property at 501 Patterson it, so far as actual or implied authority is concerned, did so on behalf of the combined churches, albeit the contract for sale reflects that it did so on behalf of Trinity, Inc.[5] For, as explained supra, even assuming that the persons comprising this board were validly elected, they were elected as officials of the combined churches, collectively known as Calvary Temple.

It remains to pass upon the trial court's determination that the election held by the Terry group on September 20, 1981, was conducted in substantial compliance with the Trinity Constitution and bylaws and that those elected on that occasion are the rightful officers and directors of Trinity, Inc. Preliminarily we note that, insofar as this case was precipitated by the blocking of the sale of the property at 501 Patterson, it was appropriate for the trial court to evaluate the respective positions of the parties with an eye toward resolving the more pressing temporal issue of who has authority to deal with that property. Thus, with respect to plaintiff's contention that the election was invalid for want of proper notice, the court justifiably concerned itself most with what notice was required for an election of *directors* and not so much with the Trinity Constitution's requirement that notice of a *pastoral* election be given two Sundays in advance. For, as provided in

---

5. We can omit consideration of apparent authority, as this case does not involve conflict between a principal-obligor and a third-party-obligee. See *Wynn v. McMahon Ford Co.,* 414

S.W.2d 330, 336[8–11] (Mo.App.1967); *Cameron Mutual Insurance Co. of Missouri v. Bouse,* 635 S.W.2d 488, 491[9] (Mo.App.1982).

Article IX § 2 of the Trinity Constitution, it is the directors who constitute the body having authority to act on behalf of the church in such matters as the sale of church property. The trial court correctly noted that, with respect to an election of directors, the Trinity Constitution includes no specific notice requirement.

As for plaintiff's theory that the election was invalid because the participants therein were not members of Trinity, it is nothing if not specious. It seems odd, even paradoxical, that plaintiff at various points should assert the nonexistence of Trinity as an organization distinct from Calvary while 1) insisting that Trinity's Constitution and bylaws serve as the yardstick with which to measure the conduct of the defendants and 2) seeking to have certain persons declared officers and directors of Trinity. The name "Calvary Temple" seems to have served the joint churches well—until the Terry group left and the remaining members of the integrated board desired to dispose of the property at 501 Patterson. Since, as Calvary Temple, these board members were powerless to accomplish this objective, they sought to be declared representatives of Trinity, Inc., the organization in the name of which the property was held and which had capacity to convey it. In our opinion it is to the trial court's credit that, unlike Isaac, whose blindness rendered him vulnerable to Jacob's deception, he was able to see through the hairy raiments in which plaintiff clothed this case.

Prefatory to affirming the trial court's decision on Counts I and II we reiterate our opening remark that this case is simply not amenable to nice resolution; a "Solomonic division" has to be made. Conceding that the trial court's actions may be criticized as less than perfect, we are nevertheless of the opinion that such imperfection as may characterize the result reached below does not rise to the level of reversible error. Quite frankly, we think the best was made of a difficult situation. And while, considering the muddle created by the Trinity-Calvary affiliation, it might seem conceptually soundest to return all concerned to the status quo ante, such a result would clearly not be feasible, given the heterogeneous alliances that have formed. Accordingly, we affirm the trial court's judgment on Counts I and II.

■ From our determination that defendants Terry, Nicholson, Wasson, and Roach comprise plaintiff's board of directors it follows that occupancy of the property at 501 Patterson by these persons is on behalf of plaintiff and not in their individual capacities. As that property is titled in the name of plaintiff, it is appropriate that it be subject to the control of the rightful representatives of that organization. Thus we affirm the trial court's decision on Count III.

■ Plaintiff in Count IV sought to replevy various items of personal property, including a bus and school equipment and supplies used in the operation of the ill-fated Calvary Christian Academy. Inasmuch as the equipment and supplies were acquired incident to the "cooperative" effort to establish a school, there exists no basis for holding either plaintiff or its newly vindicated leaders, as individuals, entitled to possession of that property. The bus, however, was an asset of plaintiff prior to the association of the two churches. We are of the opinion that the trial court's treatment of Count IV is as defensible as his disposition of the rest of this case. Therefore, we affirm the judgment as to Count IV, awarding plaintiff possession of the bus, neither plaintiff nor defendants possession of the equipment and supplies, and ordering defendants to deliver said equipment and supplies to Calvary Temple.

All concur.